**STATE of Missouri, Appellant,**

v.

**Leslie Wayne PENNINGTON,
Respondent.**

**No. WD35965.**

Missouri Court of Appeals,
Western District.

Jan. 8, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 5, 1985.

Michael D. Arnold, Pros. Atty., Gallatin, for appellant.

Syd Weybrew, Jr., Gallatin, for respondent.

Before KENNEDY, P.J., and DIXON and CLARK, JJ.

DIXON, Judge.

Pennington was charged with capital murder. Prior to trial, there was a hearing on Pennington's motion to suppress evi-

dence obtained from the car he was driving and to suppress statements he made to the police while in custody. The court overruled the motion with respect to the seized evidence and sustained it with respect to Pennington's statements. The state appeals from the order sustaining the motion as to Pennington's statements.[1] Affirmed.

A brief statement of facts is necessary to the disposition of the issues. Deputy Sheriff Huskey responded to a call and found Clarence Wright, Pennington's grandfather, dead in a Ford Falcon beside a county road. Based on information received from bystanders placing Pennington at the scene, the police found the Dodge he was reported to have been driving and Pennington, age 19, and his brother were taken into custody. Huskey read Pennington the *Miranda* warnings and Pennington later specifically stated he wished to talk to a court-appointed attorney. Pennington and his brother were then taken to the Cameron police station where Pennington was held downstairs in the $18 \times 30$ foot officers' squad room and his brother was taken upstairs. Pennington was in the constant company of between three and eight officers. Officer Jones read Pennington the *Miranda* warnings again and Pennington stated he might want to contact an attorney. Because he did not believe Pennington fully understood the warnings, Jones repeated them, specifically asking if he understood each warning. Pennington indicated he understood and, when again asked if he wished to make a statement, said nothing. Jones then told Huskey that the Chief of Police's office was available to him if it was needed. It is a fair inference that the defendant heard that statement. None of the officers attempted to contact an attorney pursuant to Pennington's request.

After waiting in the squad room for approximately 20 minutes, Pennington began to speak with Jones and asked what was going to happen to him. Jones later testified, "I told the defendant that I'd seen cases before where if the guy didn't talk that they could pin the whole rap on him, and if he wanted to make a statement don't let the guy upstairs bury you." The "guy upstairs" was Pennington's brother. Officer Huskey, who was also present, told Pennington he would remain in custody for approximately 24 hours and his clothes and other evidence would be analyzed by the lab. Pennington then left the squad room, accompanied by Huskey, to use the rest room. On the way back to the desk where he had been sitting, the defendant asked Huskey whether Huskey wanted to use the office. Huskey asked the defendant if he wanted to make a statement. They went in the office, and defendant made the first of three statements.

The state has briefed two points. It first alleges the court erred in finding Pennington had standing to challenge the lawfulness of the automobile search. The court so found, but also found the search was incident to an arrest based on probable cause and was valid. It then overruled Pennington's motion to suppress evidence obtained in the search.

■ The state may appeal only those orders or judgments that result in quashing an arrest warrant, suppressing evidence, or suppressing a confession or admission. Section 547.200.1 RSMo Supp. 1983; *State v. Little River Drainage Dist.*, 490 S.W.2d 675 (Mo.App.1973). Here, the court's order was a refusal to suppress evidence. The state is not an aggrieved party and the order does not fall within the statute's ambit.

■ The state also asserts the court erred in sustaining Pennington's motion to suppress statements made while at the station and in police custody. It contends Pennington initiated the discussion and his statements were made after a knowing waiver of his rights. The trial court found that, based on the "totality of the circum-

---

1. The State first appealed to the Supreme Court and the appeal was by order transferred to this court. Section 547.200.3 RSMo Supp.1983 provides for review by the Supreme Court in appeals by the state in capital murder cases. The order explicates no reason for the transfer, except to state that jurisdiction is vested in this court.

stances," the State had not met its heavy burden to show that Pennington's statements were voluntarily made or that his question to Officer Jones constituted an "initiation." "[I]n reviewing the trial court's determination on the motion to suppress, the weight of the evidence and credibility of witnesses are questions for the trial court's resolution." *State v. Richter*, 647 S.W.2d 513, 519 (Mo. banc 1983). Thus, his rulings on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. *O'Laughlin v. Barstow*, 654 S.W.2d 95, 97 (Mo.App. 1983).

Deputy Huskey read Pennington the *Miranda* warnings soon after his arrest and then asked if he wished to make a statement. Pennington did not respond but a short time later specifically requested a court-appointed attorney. At the station, Pennington was again read the *Miranda* warnings by Jones and he stated that he did not wish to say anything but might "want to contact a lawyer." Officer Jones, who did not believe Pennington understood the warnings, repeated them and Pennington remained silent. Thus, Pennington twice invoked his right to counsel and remained silent after both warnings.

The 19-year-old Pennington had been in the squad room, surrounded by between three to eight officers, none of whom contacted an attorney pursuant to his request, for approximately 20 minutes, when he asked Jones what was going to happen to him. Jones responded that, "I'd seen cases before where if the guy didn't talk that they could pin the whole rap on him, and if he wanted to make a statement don't let the guy upstairs bury you." Moments later, Officer Huskey told Pennington he would be held for investigation for 20–24 hours and his clothing and other evidence would be sent to the lab for analysis. Then, approximately 15 minutes after his conversation with Jones and 40 minutes after being brought to the police station, Pennington made a statement. He later made yet another statement after being told that his brother, the "guy upstairs," had talked. A third statement was taken sometime later.

The state's argument is that Pennington knew the office was available, and that his query of Huskey as to the use of the office was a voluntary waiver of his rights. The state further argues Huskey's inquiry and the defendant's subsequent statement adds to the preceding events a knowing waiver of defendant's right to silence and to counsel.

The trial court found, based on the totality of the circumstances, *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981), that Pennington's statements were not voluntarily made and that he had not initiated the conversation so as to freely and voluntarily waive his right to counsel. Pennington had twice invoked his right to counsel while in police custody. The officers conceded that no one attempted to contact an attorney, as Pennington had requested. Although Pennington asked what was going to happen to him and thus began further conversation with the officers, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); *See, State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981); *State v. Gibson*, 623 S.W.2d 93 (Mo.App. 1981). The trial court correctly found the state did not meet this burden. Officer Jones' response at the very least clearly suggested that Pennington would be much better off by promptly making a statement and Officer Huskey's statement was also coercive. Pennington's free will was thus overborne when he made the statements. *State v. Higgins*, 592 S.W.2d 151, 158 (Mo. banc 1979); *State v. Rickey*, 658 S.W.2d 951, 953–54 (Mo.App.1983). Their dialogue can be readily distinguished from that approved in *Oregon v. Bradshaw, supra*. In *Bradshaw*, when the defendant asked what would happen to him, the officer immediately reminded him that he did not have to speak with police. Here, in response to

 

Pennington's query, the officers plainly sought to persuade and coerce a statement.

⬛ Pennington did not knowingly or intelligently abandon his right to counsel. *Edwards*, 451 U.S. at 482, 101 S.Ct. at 1883–84. He was 19 years old, in a police station surrounded by as many as eight officers for approximately 40 minutes. He requested counsel but no one was provided him. He had been told he would remain in custody for about 24 hours and his clothes and other evidence would be analyzed by the lab. Finally, Officer Jones used the fear that his brother would implicate him in the crime to suggest to Pennington that he would be in a much better position if he were to make a statement. The court did not abuse its discretion in finding that, under the circumstances, the defendant did not voluntarily waive his right to counsel and that the State did not meet its heavy burden of proving such voluntary waiver. Affirmed.

All concur.